[No. 22637. Department Two. May 19, 1931.]

E. S. GRAMMER, *Appellant*, v. SKAGIT VALLEY LUMBER COMPANY, *Respondent*.[1]

*McMicken, Ramsey, Rupp & Schweppe* and *Battle, Hulbert & Helsell*, for appellant.

*Peters, Powell, Evans & McLaren*, for respondent.

BEELER, J.—The plaintiff has appealed from an order sustaining a demurrer to his complaint and from a judgment dismissing the action. The trial court sus-

[1]Reported in 299 Pac. 376.

tained the demurrer on two grounds: (1) Because the complaint failed to allege that plaintiff held a real estate broker's license; (2) that the contract was within the statute of frauds.

The first question presented is, was plaintiff employed as a real estate broker within the meaning of the provisions of the real estate brokers' act (Rem. 1927 Sup., §§ 8340-1 to 8340-23 inclusive), which provides:

"Section 8340-4. Within the meaning of this act, a real estate broker is a person who, for a compensation or promise thereof, *performs one or more acts of selling or offering for sale, buying or offering to buy, negotiating or offering to negotiate, either directly or indirectly, whether as an employee of another or otherwise,* the purchase, sale, exchange, lease or rental of real estate or interest therein for another person.

"Section 8340-5. It shall be unlawful for any person to engage in the business or act in the capacity of a real estate broker within this state without *first obtaining a license* therefor and otherwise complying with the provisions of this act.

"Section 8340-20. No suit or action shall be brought in the courts of this state for the collection of compensation for the performance of any of the acts mentioned in section 8340-5, *without alleging and proving* that the plaintiff was a duly *licensed* real estate broker at the time the alleged cause of action arose." (Italics ours.)

Plaintiff in his complaint alleges that "for many years he has been engaged in the lumbering business in this state," and "is acquainted with and an expert in lumber and timberlands," and in the "hauling and marketing of logs and lumber;" that

" . . . the plaintiff at all times herein mentioned was well acquainted with the lumbermen of the state of Washington and the Pacific Coast; that the plaintiff knew what was necessary in the preparation of data and information generally regarding timber and tim-

ber lands and milling property, and in presenting the same for sale to prospective purchasers, all of which was well known to the officers of the defendant company.''

The complaint then sets forth that the defendant was

''. . . the owner of a large amount of real and personal property located in Skagit county, Washington, consisting of lumber mill and personal property in connection therewith; railroad, rolling stock and equipment and other personal property in connection therewith; buildings, lands and timber, all of which constituted a going concern, but closed down and inactive''

at the time of the execution of the contract on September 14, 1928.

The complaint further alleges that the plaintiff immediately after the execution of the contract ''entered upon its performance'' and

''. . . prepared said properties for presentation to any prospective purchasers; obtained and compiled data and information for presentation to a prospective purchaser; cruised the timber owned by the defendant, and other timber adjacent and tributary thereto; prepared estimates of cost of procuring, manufacturing and disposing of logs and lumber in connection therewith; obtained options on other timber, and other data and information necessary to present to any prospective purchasers, and otherwise performed services that *resulted* in obtaining a buyer of all of said properties, real and personal, of the defendant, and was responsible for the consummation of the sale for the sum of $1,500,000,''

and ''that there is due him for services rendered $150,-000;'' that payment has been demanded but refused.

Paragraph IV of the complaint alleges:

''That under the terms of said contract, the plaintiff had no right or authority to make any representations of any kind relative to said properties, or any

part thereof, or to make any offers of any kind or character for the sale of said properties, but it was agreed that if the plaintiff should be responsible for the consummation of the sale of said properties as a whole, the defendants herein agreed to pay to the plaintiff compensation according to the rate specified and set forth in said contract hereto attached and made a part hereof.''

The material parts of the contract are:

''THIS AGREEMENT made and entered into this 14th day of September, 1928, by and between E. S. Grammer, first party, and Skagit Valley Lumber Company, a corporation, second party,

''Whereas, the second party is desirous of *selling its properties* both real and personal, as a whole, and the first party is *interested* in attempting to *obtain a buyer* for the properties, to which end the first party has been or may be made vice-president of the second party *with authority to negotiate on behalf of the second party for the* sale of its properties:

''Now, therefore, . . . it is mutually agreed, .

''*First:* The second party hereby employs the first party to endeavor to *obtain a buyer* for all of the properties, both real and personal, . . .

''*Second:* The first party is to use his *best efforts* to *consummate a sale* of the said properties of the second party as a whole, to which end the first party *agrees to keep the board of trustees of the second party fully advised of all efforts made by him to consummate such sale and all steps taken by him or letters or other communications written or made by him in connection therewith.*

''The *authority hereby conferred* by the second party upon the first party *shall be the authority to negotiate* and *obtain offers* relating to or for sale and purchase of said properties, but the first party shall have *no* authority of *any kind* or *character* to otherwise represent the second party or to make any *offers of any kind* or *character* for the *sale* of said properties or any part thereof, to anyone, or to make any representations of any kind relative to said properties, or any

part thereof, binding upon the second party, or to make any agreements or incur any obligations binding upon the second party, of any kind or character whatsoever, or to incur any expenses for or on behalf of the second party binding upon it, or which it shall be obligated to pay, *except such obligations, agreements and expenses as may be specifically* approved by the board of trustees of the second party.

"*Third:* If during the term of this agreement the first party is *responsible for the consummation* of the sale of said properties as a whole, the second party agrees to pay the first party the following percentages of the amounts received by the second party from the sale of the said premises."

The contract then sets forth in detail the compensation plaintiff is to receive in the event of a sale of the properties.

"*Fourth:* In the event that upon the termination of this agreement a bona fide offer, for which the first party is *responsible* shall have been made by the second party to a prospective purchaser, or by a bona fide purchaser to the second party, which said offer shall be accepted after the termination of this agreement, the first party shall be entitled to commissions hereunder as if such sale had been consummated during the term of this agreement."

Plaintiff contends that he was not employed to make a sale of the property or offer it for sale. He contends that he obtained no purchaser. He contends he at no time either directly or indirectly *negotiated* with any prospective purchasers for the sale of the property. But his claim is that he was the *procuring* cause of the sale. He alleges that he *prepared* the properties for presentation to prospective purchasers by compiling data and information, and that he cruised the timber owned by the defendant, and other timber tributary and adjacent thereto; prepared estimates of the cost of procuring, manufacturing and disposing of logs and

lumber, and obtained options on other timber; and that the data he thus procured was necessary to present to prospective purchasers, and that he was *responsible* for the consummation of the sale. In short, plaintiff says he was not a broker as the term is used in the statute, and hence the agreement is not affected by the statute.

Turning again to the agreement which is attached to and made a part of the complaint, we find it contains in part the following:

Plaintiff "is interested in attempting to *obtain* a buyer;" that the defendant "hereby employs the first party to endeavor to *obtain* a buyer." The plaintiff is to "use his best efforts" in consummating a *sale*. "The authority hereby conferred upon the first party shall be to *negotiate and obtain offers relating to or for the sale and purchase* of said property." The contract further provides that plaintiff "agrees to keep the board *fully advised of all offers made by him to consummate such sale and all steps taken by him or letters or other communications written or made by him in connection therewith,* and that if he is responsible for the consummation of the sale of said property as a whole, the second party agrees to pay the following percentages, etc." *The contract further provides the word "Consummation" as used herein shall mean the acceptance by the board of a bona fide offer made to it.*

"Negotiate" is defined in the Oxford Dictionary:

"To hold communication or conference (with another), for the purpose of arranging some matter by mutual agreement; to discuss a matter with a view to some settlement or compromise. To deal with, manage, or conduct (a matter, affair, etc., requiring some skill or consideration). To arrange for, obtain, bring about (something) by means of negotiation."

Webster's New International Dictionary defines the word:

"To carry on negotiations concerning; to procure, or arrange for, by negotiation. To hold intercourse or treat with a view to coming to terms upon some matter, as a purchase or sale, a treaty, etc.; to conduct communications or conferences as a basis of agreement; as, to negotiate for the purchase of a house."

Words & Phrases (3d series), vol. 5, p. 404, defines "negotiate":

" 'Negotiate' is to transact business, to treat with another respecting a purchase and sale, to hold intercourse, to bargain or trade, to conduct communication or conferences. It is that which passes between parties or their agents in the course of or incident to the making of a contract; it is also conversation in arranging terms of contract."

■■ The statute precluding a broker from recovering commissions unless his authority is in writing, is in derogation of the common law and must be strictly construed. But this contract clearly evidences that the real function plaintiff was required to perform under the contract was to *procure* a purchaser. He had no other duty to perform. The contract specifically provides; "Plaintiff is *employed* to *obtain a buyer* for all of the properties." Plaintiff admits he had the *authority to negotiate* and *obtain an offer*, but argues that such authority is an entirely different thing from the authority to "sell or offer to sell, buy or offer to buy, or negotiate or offer to negotiate the purchase, sale, exchange, lease or rental of the real estate." True, the contract casts certain limitations and restrictions on the powers of the plaintiff. He was prevented from making or submitting an offer; he was prevented from binding the defendant by making representations or statements; he could not bind the defendant by incurring any expenses. But, nevertheless, he was a broker with limited authority. He was authorized to *obtain a buyer,* and to *negotiate* and

*obtain offers.* As was well and tersely stated by the trial court:

"It is, however, insisted by counsel for the plaintiff that the plaintiff did not have the authority to either sell, offer for sale, negotiate, or offer to negotiate, the sale of any real estate or any interest therein, but that his power was restricted to the mere negotiation and obtaining of an offer, and that he was therefore not acting as a real estate broker. With this conclusion, I am unable to agree, because the clause referred to, by the addition of the closing phrase, '*except such obligations, agreements and expenses as may be specifically approved by the board of trustees of the second party,*' only qualifies to that extent the general powers given to the plaintiff by the preceding paragraphs of the agreement. Construed as counsel for plaintiff insist, the preceding clauses, generally authorizing the plaintiff to use his best efforts to obtain a buyer and to consummate a sale of the properties, would, it seems to me, be without effect or meaning. Fairly construing and giving full effect to all of the provisions of the contract, I am of the opinion that the plaintiff was given authority by, and it was his duty under, the contract to endeavor to obtain a buyer for and to use all his efforts to consummate a sale of the real and personal property of the defendant, but that no offers of purchase or sale obtained by him, or expenses incurred by him, were to be binding upon the defendant unless expressly accepted or authorized by the defendant. In other words, he was authorized to offer the property for sale, subject to acceptance by the defendant."

We are satisfied that the plaintiff was employed as a broker, and that the contract is one falling within the terms of the real estate brokers' act. There being no allegation in the complaint that the plaintiff had obtained a license as required by the act, the complaint was vulnerable to attack by demurrer. The case of *Baird v. Krancer,* 138 Misc. Rep. 360, 246 N. Y. Supp. 85, is in point. There the plaintiff sued to recover a brokerage of $7,500 for services in aiding defendants

to secure a building or construction loan for an apartment house. Suit was brought on a written contract. Plaintiff alleged that his services consisted of *introducing* one of the defendants to persons who were in a position to furnish funds for the erection of the proposed apartment house, and in "assisting" the said defendant in procuring contracts or offers for such financing. At the close of plaintiff's case, the court dismissed the action on the ground that plaintiff, having failed to allege and prove that he was a licensed real estate broker, could not maintain his suit under the statute. Passing on the question, the court said:

"The court is constrained from the evidence in the case submitted by the plaintiff to arrive at the conclusion that this was an action for real estate brokerage as contemplated by section 440 of the Real Property Law, and it was clearly the intent of the Legislature to protect dealers in real estate from unlicensed persons who acted as brokers that the statute was enacted. To interpret the statute so as to permit men under the guise of an alleged introduction to evade section 440 would simply nullify the statute and would expose the public by judicial interpretation to the very evils that the Legislature and the reputable brokers of the state sought to protect it from. . . . If real estate is going to be the principal element involved in the transaction, a broker has to have a license and cannot evade its necessity by referring to the services as originating or introducing or any other fantastic term. A statute enacted for the protection of the public must be interpreted fairly to effect the purposes of its enactment. It is not to be rendered ineffectual by a strained construction.

"The essential feature of a broker's employment is to bring the parties together in an amicable frame of mind, with an attitude toward each other and toward the transaction in hand which permits their working out the terms of their agreement. They may reach that agreement without his aid or interference. Indeed, in a transaction of any magnitude, the terms

would never be settled beforehand or negotiated finally by the broker. Each party would always wait until in direct contact with the other side in order that he might drive the best bargain possible. The broker would have no opportunity to induce one party or the other to agree upon some or all of the terms, and would not be expected to do so. He would be entitled to his commission if the parties agreed upon terms originally proposed by one or the other, or agreed between themselves after the introduction.

"This does not mean that the broker has not *negotiated* the transaction. He does that when he builds up in the minds of the parties a desire to do the business. He never cares what the terms are, so long as the agreement occurs. If the statute does not apply to such a situation, then it is a toothless enactment. Every *unlicensed* broker will make the same argument that the plaintiff here has made, that he did not have to bring the parties to actual agreement upon all the details, that that phase was something for the parties themselves to determine. In short, every unlicensed broker will be enabled to *carry on his business* just as he did before the statute came into existence, simply by calling himself a *finder,* an *originator,* an *introducer,* instead of a *broker.* This would be an absurd limitation of the statute and one unfounded in reason or policy. A broker 'negotiates' just as much when he brings parties together in such frame of mind that they can by themselves evolve a plan of procedure, as when he himself carries on the discussion and personally induces an agreement to accept a specific provision." (Italics ours.)

Plaintiff's counsel places special emphasis upon the following authorities: *Chambers v. Kirkpatrick,* 145 Wash. 277, 259 Pac. 878; *Shaffer v. Beinhorn,* 190 Cal. 569, 213 Pac. 960; *Land Co. of Florida v. Fetty,* 15 Fed. (2d) 942. These authorities, however, are readily distinguishable from the instant case.

In the *Chambers* case, *supra,* the plaintiff was employed merely to take the defendant to the land and

point out to him its corners. He was not employed to procure or obtain a purchaser for the timber.

In the *Shaffer* case, *supra,* the plaintiff had no contract with the owner of the property, nor was he a middleman between the seller and the buyer. The action there was between two real estate brokers based upon a contract between themselves as to a division of the commissions. All that the plaintiff was required to do was to bring to the defendant, who had a contract with the owner, a prospective purchaser, and the defendant in turn was to negotiate the sale with the owner. There the defendant was the broker, and he was authorized by the owner to negotiate a sale, the plaintiff having no such authorization.

In the *Land Co. of Florida* case, *supra,* the decision is bottomed on a Florida statute which differs from our statute. The Florida statute defines a real estate broker as one who "sells or offers for sale, etc., real estate *as a whole or partial vocation."* It was the latter part of this phrase which controlled the decision of the court in holding that the statute had no application to one who was employed to carry out a single transaction. Our statute contains no such phrase or limitation, but specifically provides,

". . . a real estate broker is a person who for compensation or promise thereof, performs one or more acts of . . . negotiating or offering to negotiate, . . ." Rem. 1927 Sup., § 8340-4.

Coming now to the second question on which the trial court sustained the demurrer. The statute of frauds in part provides:

"In the following cases specified in this section, any agreement, contract and promise shall be void, unless such agreement, contract or promise, or some note or memorandum thereof, be in writing, and signed by the party to be charged therewith, or by some person thereunto by him lawfully authorized, that is to say: . .

. . (5) an agreement authorizing or employing an agent or broker to sell or purchase real estate for compensation or a commission.'' Rem. Comp. Stat., § 5825.

The contract does not describe the real estate either by section, township, range, county, or state, and, hence, the contract in that regard is fatally defective. In a contract between an owner and a broker for the sale of real property, it is imperative that the real estate be described with particularity.

In *Cushing v. Monarch Timber Co.*, 75 Wash. 678, 135 Pac. 660, Ann. Cas. 1914C 1239, we said:

''By an unbroken line of decisions we have held that, to meet this statute, the writing evidencing the agreement must be so complete in itself as to make a resort to parol evidence to establish any material element of the agreement unnecessary. The rule deduced from prior decisions and tersely expressed in *Engleson v. Port Crescent Shingle Co.*, 74 Wash. 424, 133 Pac. 1030, is that:

'' 'A writing sufficient to satisfy the statute must be coextensive with the stipulations of the parties; that is to say, it must express the entire contract and leave nothing that pertains to the essentials of the contract to be supplied by parol.' ''

See, also, the following: *Rogers v. Lippy*, 99 Wash. 312, 169 Pac. 858, L. R. A. 1918C 583; *Nance v. Valentine*, 99 Wash. 323, 169 Pac. 862; *Larue v. Farmers & Merchants Bank*, 102 Wash. 434, 172 Pac. 1146; *Farley v. Fair*, 144 Wash. 101, 256 Pac. 1031.

Judgment affirmed.

MITCHELL, BEALS, MILLARD, and FULLERTON, JJ., concur.