[Civ. No. 4637.   Fourth Dist.   June 8, 1953.]

JOHN MALCOLM OHANESIAN, Appellant, v. D. D. WATSON, as Real Estate Commissioner, et al., Respondents.

John Said for Appellant.

Edmund G. Brown, Attorney General, and August F. Cetti, Deputy Attorney General, for Respondents.

BARNARD, P. J.—This is an appeal from a judgment denying an application for a writ of mandate.

The petitioner was a licensed real estate broker. An accusation was filed with the Real Estate Commissioner charging him with a violation of the provisions of subsections (a), (b), (d), (g) and (i) of section 10176 and subdivision (f) of section 10177 of the Business and Professions Code. After the usual hearing, the petitioner was found to have violated subsections (d), (g) and (i) of section 10176 and subsection (f) of section 10177, and an order was entered suspending his license for a period of 90 days. He applied to the superior court for a writ of mandamus and at the hearing it was found that the findings of the Real Estate Commissioner were supported by the evidence, and the petition was denied.

The following facts appear in the evidence. On February 4, 1951, the petitioner obtained from Mr. and Mrs. Nazarian an exclusive right to sell their 20-acre ranch at a price of $13,000. The petitioner advertised this ranch for sale in a newspaper at a price of $13,500. Mr. and Mrs. Trower read this advertisement and contacted the petitioner. On February 15, 1951, they gave the petitioner an exclusive right to sell their house in Fresno for $10,000, inserting a provision that the cash proceeds from the house were to be applied to buy this Nazarian ranch at $13,000. The petitioner did not advertise the Trower house or send any prospective buyer to look at it. On the morning of February 25, 1951, the petitioner called Mr. Trower and told him that since their house had not been sold, he was selling the Nazarian ranch to a

third party; that he had a written contract with this third party; and that he had received a $500 deposit on the ranch. Mr. Trower asked that the listing on his house be canceled and petitioner agreed to do so. Trower went to petitioner's office shortly after noon on that day and petitioner gave him back the listing on the house, having written across the face of it the word ''canceled,'' with a date and his signature.

Later that day a man named Peterson called at the Trower house and offered them $9,600 for the house. They were unwilling to sell the house unless they could get the ranch, so they told Peterson they would let him know before 7 o'clock that night. Mr. Trower contacted the petitioner about 6 p.m. and asked if there was any way he could still purchase the Nazarian ranch if he sold the house to the Petersons for $9,600. The petitioner told Trower that he would prefer to sell the house to him, as he was a better financial risk, and agreed to let him have the ranch.

On the next day the Trowers and the Petersons signed escrow papers for the sale of the house at the office of a title company, after which the Trowers met the petitioner in the office of the same title company for the purpose of going into escrow on the sale of the Nazarian ranch to the Trowers. The petitioner then told Mr. Trower that he would not let the ranch deal go through unless he was paid an extra $500, stating that he was the loser on this property and would have to have an extra $500. Mr. Trower, not wanting to lose the ranch deal, offered to add $500 to the purchase price of the ranch but the petitioner refused to allow this, saying that he had to have the money himself. After some discussion, the Trowers and the petitioner went to the escrow officer handling the house deal and those instructions, which provided that no commission was to be paid, were changed to provide for the payment of a $480 commission to the petitioner. The escrow papers on the ranch deal were then signed, both escrows were later closed, and the petitioner received $640 commission from the Nazarians and $480 from the Trowers. The Nazarians knew nothing of any such payment from the Trowers. About a month later, the Nazarians discovered that the Trowers thought they had paid $13,500 for the ranch. A complaint was then made, and the administrative proceeding followed.

The appellant first contends that there is no substantial evidence to support the finding to the effect that he failed to reimburse the Nazarians for operating costs on their ranch between the date of the listing and the time the Trowers took

over the work, a period of 24 days. That listing contract provided for the payment of such expenses, not exceeding $500, in the event of a sale of the ranch. The appellant admitted that he agreed to pay for such expense, but he argues that only a few days intervened between the time the matter was placed in escrow and the time the Trowers took over the work. There is evidence that the petitioner made no attempt to adjust this matter with the Nazarians. There is also evidence that the petitioner gave a check for $50 to the Nazarians, but it does not appear what this was for. While the evidence on this is not very satisfactory, the matter is not important in view of the other findings.

It is next contended that there is no substantial evidence to support the finding that the appellant violated section 10176 (d), by acting for more than one party without the knowledge or consent of all parties. The appellant admits the fundamental rule that a real estate broker cannot represent both parties in a transaction without the knowledge and consent of all parties involved, but contends that there is a common law exception making this rule inapplicable where the broker acts merely as a "middleman." Assuming that this exception could apply in such an administrative proceeding in view of the provisions of section 10176 (d), the evidence here convincingly shows that the appellant was not acting as a mere "middleman." He accepted a written appointment as agent for the Nazarians and agreed to use his best efforts in selling their property; he advised them with respect to the price and terms at which they should offer the ranch for sale; he advertised the ranch for sale; he carried on extensive negotiations with the Trowers, who were trying to buy the ranch, and got them to reduce the selling price of their house from $11,000 to $10,000; he secured a written agreement for the sale of the ranch and accepted a deposit from a third party; he then set that deal aside and concluded one with the Trowers; the Nazarians and Trowers never saw each other until all of the details had been completely worked out by the appellant; and he then prevented the Nazarians from receiving $13,500 for their property. The appellant acted as an agent in the usual manner and he cannot, under the circumstances, be considered as merely a "middleman." (*Rhode* v. *Bartholomew*, 94 Cal.App.2d 272 [210 P.2d 768].)

It is next contended that there is no substantial evidence to support the finding that the appellant took a com-

mission to which he was not entitled. This relates to the $480 which the appellant compelled the Trowers to pay as a commission on the sale of their house, before he would allow them to proceed with the purchase of the Nazarian ranch. Appellant's sole contention is that he intended his cancellation of the listing on the Trower house to be conditional; that the Trowers had a sale to the Petersons in mind when they asked the appellant to cancel that listing; that it thus appears that the Trowers obtained that cancellation by fraudulently concealing the facts from the appellant; and that it follows that the cancellation was ineffective and the agreement to pay a commission was still in force. This argument is based entirely on a conflict in the evidence. While the appellant testified to that effect, there was ample evidence that the cancellation of that listing was not conditional; that it was canceled because the appellant had sold the ranch to a third party and had taken a deposit; that the Trowers knew nothing of the Peterson deal until after the appellant's listing on their house had been canceled; and that they later reduced the selling price to the Petersons because they understood that there would be no commission to pay. The conflict was resolved against the appellant, in the administrative proceeding and by the trial court, and the evidence is sufficient to sustain the finding made.

Appellant's final contention is that the findings are inconsistent in that it was found that he had violated section 10176 (d), (g) and (i) and section 10177 (f), and was also found that he had not violated subsections (a) and (b) of section 10176. We see no inconsistency between these findings, and nothing in this connection which would in any way prejudice the appellant. The evidence indicates that the findings, and the penalty imposed, were more favorable to the appellant than they might well have been.

The judgment is affirmed.

Griffin, J., and Mussell, J., concurred.